Nath ah D. Lapham, Off. Ref.
In May, 1955 plaintiff instituted this action, seeking a judgment evicting defendants and each of them from its premises, and temporarily and permanently enjoining them from trespassing thereon, from constructing and maintaining the dam thereon, from interfering with operation by plaintiff of its spillway, dam and gates or its control of the level of Findley Lake, and for damages.
The answer interposed by defendants was a general denial and set up three defenses of alleged imminence of danger to life, health and property by reason of the exposed lake bed; prescriptive right and public interest in the minimum level of Findley Lake as it existed for many years past.
By stipulation of the parties, an order was filed September 8, 1955, temporarily enjoining defendants from the operation and control of the gates in the dam or interfering with the operation of the said dam and gates by plaintiff pending the trial and *359 determination of this action, on the condition plaintiff would not permit the lake level, insofar as it could be controlled by the gates of the dam, to be lowered below 32 inches above the spillway; directing defendants to file a bill of particulars; and referring the issues in this action to me as Official Referee to hear, try and determine. The provisions of this order were honored. The trial, held at the courthouse at Mayville, Chautauqua County, New York, consumed eight days from September 26 through October 19, 1955, and the case was finally submitted April 27, 1956.
The historical background is important to an understanding of the present controversy. An Irish immigrant named Findley, exploring the area in the early years of the Nineteenth Century, came upon a valley threaded by a stream broadening into ponds or small lakes at two points, and hemmed in by sloping hills. About 1813 he and his sons dammed the stream and there built a mill and their homes, the nucleus of the little community that sprang up at the foot of this expanded body of water, both bearing the name, Findley Lake. Some six years later, he placed his holdings on a firmer footing by purchasing from the Holland Land Company 363 acres including the dam site. From the Findley heirs, this property, immediately around the dam, by mesne conveyances in 1892 came into the hands of two young immigrants from Germany, the Swartz brothers, and remained in the hands of members of this family until 1949 when it passed to the plaintiff. The last owner in the Swartz line testified that his father, after he took over the property, replaced the wooden spillway in 1908 by the concrete spillway now there, and used solid gates opening from the bottom; that they maintained the water at as high a level as possible because it was power for them, the cottages being incidental, lowering the gates at night to retain the water because during the Summer they were frequently very short of power; and that they always took care of retaining and releasing the water. Mr. Swartz actively operated the mills from 1920 until 1942 and continued to maintain the dam and exercise control of the gates until the property was purchased by plaintiff association August 13, 1949. About that time the machinery was removed and the mills torn down. He said no town official ever exercised care over the spillway or gates and there was no official complaint as to the manner of operation, although “We had lots of people come to us and want the lake lowered ”; and no financial participation by the town in the construction and upkeep of the dam or spillway.
It was the alarming increase of weeds in this lake that impelled the plaintiff to action, and laid the foundation for the clash which *360 resulted in this litigation. According to the evidence there has long been a few weeds along the shallow upper or southern end of the lake and Mr. Swartz testified that during their regime they raked out the weeds that came down and formed at the bars in front of the mill and ‘ ‘ used to have quite a haystack * * * once in a while ’ ’. But, generally, the lake was free from weeds until about 1940 when a new type of weed appeared and has increased rapidly. The Navigation Commissioner of Chautauqua County, one of whose duties is to patrol the lake in the boating season, testified the weed growth had increased greatly since 1948, and in fact by 50% since the water was lowered in 1954. While this rate of increase may be exaggerated, the litigants are in accord that the weed condition has been worsening. The Referee, accompanied by counsel for the parties, visited and rode around the lake September 26, 1955, and observed the surface covered for the most part by a heavy web or network of weeds with an occasional clear, sharply defined path to a dock where the weeds had been cut. The vegetation now threatening the lake is a form of Carolina water weed probably brought in by migratory fowl, fast growing, prolific, with tendrils 10 to 15 feet long, which found a congeniel habitat in the heavily silted floor of this shallow lake, not subjected to the cleansing action of a strong current in an outflowing stream.
This condition became so annoying and alarming that, when Clifton Howard returned from military service in World War II, two or three property owners appealed to him to join them in an attempt to get rid of the weeds. Mr. Howard is a man of 52 who has been familiar with the lake since a lad of 5. His grandfather and father had cottages here, and 30 years ago be acquired a lot with a lake frontage of 300 feet on which are his Summer home and boathouse. He resides over the line in Pennsylvania, and is an engineer by profession, serving as division superintendent of operations of an electrical utility. He suggested, and was a moving force in, the formation and functioning of the plaintiff corporation, served as its president for the first two years, then as vice-president and as a director, was its main spokesman on the trial and it is apparent is the principal target of the opposition.
Mr. Howard testified that he had been deterred for years from attempting improvements in and about the lake because he realized that without the support from those interested it was going “to be an awful uphill job” due to the opposition generally of a few natives to moves for the betterment of the lake. A sharp cleavage in the thinking between the permanent residents and members of plaintiff corporation was evidenced *361 on the trial by the thinly veiled or openly asserted animosity and bitterness displayed. This is the more difficult to comprehend when we consider that the all-year population of the Town of Mina of about 1,012 is tripled by the influx of Summer people with the consequent benefit to farmers and tradesmen, and, also, the importance to the tax structure of this small rural township of the large cottage colony which was drawn by the lake and will only thrive if that body of water remains an attraction.
Of course the line of demarcation is not absolute. As would be expected, all the cottagers are not actively aligned with the plaintiff. There are some 200 or more cottages ringing Findley Lake, including about 15 used as year-round homes. Of this number some 90 odd owners, or slightly less than one half, are members of Findley Lake Property Owners, Inc., which on the trial was referred to as the “ Association ”. For convenience, the Referee follows that practice here. About half of the Summer resident members live outside the State of New York, not surprising when we consider how close this lake is to the Pennsylvania and Ohio borders.
The Association is not a closed, clannish, tightly-guarded group, but open to all who care to join. Through press notices posted in stores and by word of mouth every property owner in the town (whether in or out of the State, whether the property was situate on the lake or not) was invited to the first organizational meeting at which the corporation was formed. Two hundred attended but the town people in general showed little interest. Mr. Howard testified that personally and as an officer of the corporation he had “ invited the Town Board, its president ” at various times to Association meetings. Some of the meetings were held in the fire hall convenient to the public. Plaintiff is a duly organized membership corporation made up of two classes of members, permanent and annual, with equal voting rights. The certificate of incorporation was filed in the Chautauqua County Clerk’s office October 16, 1948, and by-laws adopted at the annual meeting the following August. The Referee is satisfied the Association has carried on its affairs in an open and orderly manner but it may be its initiative and systematic efficiency have been an irritant to the more easygoing defendants. Without passing at this time on whether or not it was within its legal rights in adopting the course pursued, the record shows the members of this association did not move hastily and without investigation and consideration. In September, 1948 Mr. Howard obtained an option to purchase the Swartz property for $4,800, which he later assigned to the plaintiff. .The Association raised the money necessary to make *362 the purchase from the sale of membership certificates. But before taking up the option, an investigation was made pointed toward the rights and privileges that would follow the title, and representatives went to Albany and interviewed the Attorney-General, the head of the Conservation Department and someone in the Department of Public Health. The purchase price was paid and the deed received August 13, 1949.
After acquiring title, plaintiff replaced the Swartz gates which opened from the bottom with new ones. Mr. Howard testified that when gates opened from the bottom, the draft of water was such that it would suck any fish within 25 feet of the opening out of the lake, whereas, if water was released over the top, but a few small fish would escape. The Association’s gates were designed in two sets of three each, the lowest ones resting on the concrete base of the spillway were 32 inches high, the middle ones 21 inches, and the upper ones 16 inches, with the surplus water flowing over the top rather than out the bottom. Then plaintiff, at its own expense, entered on a program calculated to improve the lake and surroundings, which has been carried on continuously until the Spring of 1955, when defendants intervened. That Fall, by means of a crane and clam, they removed 60 truckloads of silt and weeds adjacent to the dam site to improve its appearance; employed a contractor to clean up garbage dumped around the lake; cut off tops of over 300 stumps; hauled 60 loads of sand to the shore to make a wading place for small children; tore down the old mill and a barn considered unsightly and a fire hazard and cleaned up the yard north of the dam. There is testimony that the Association had started to make a public park at the outlet. Plaintiff also established rules on the lake governing speed and operation of motor boats; encouraged the instaEation of septic tanks as a sanitary measure; patrolled the woods and highway surrounding the lake, picked up and hauled away 125 truckloads of garbage and covered the town dump by bulldozer; in July, 1954 it hired a weed cutter and cut about five acres of weeds some four feet below the surface, and hauled them away, but they grew back to the surface that same season; and finaEy, plaintiff consulted the Conservation Department at Albany regarding this weed pest. Evidence of these various projects was received merely as part of the historical background and as bearing on the good wiU and credibility of the Association and is in no way determinative of the issue of plaintiff’s right to manipulate the water level of the lake. But it cannot be gainsaid all this effort was pointed toward increasing the safety and enjoyment of all who used the lake or lived near it, and should have furnished some *363 assurance to nonmembers that the Association was not motivated by selfish or deleterious aims. The only participation of the Town Board in this work was, on request, to permit the sanitary regulations to be issued and posted over its name.
This dam has been used for water power purposes since first built by Findley until 1942. Lawrence Swartz, a man 56 years of age, who was born at Findley Lake and familiar with the mills from a lad, speaking for his family, said they considered the water in the lake for their operation and “ never thought about it, never even considered it, in any other way”. “All we wanted it for was power”. “We used it whenever we needed it ” without taking into consideration the fact it might drain the lake down if used in Summer. They permitted the Fire Department and residents to draw water from the lake for their needs without question. In the dry Summer season he said many wells would go dry and farmers were wont to drive their cattle down to drink, and to haul water from the lake and cottagers pumped water for sprinkling their lawns; that even in the dry season when water was low what little they pumped out did not make “ a drop in the bucket ”. The public generally used the lake for fishing, boating, picnicking and swimming. “ There was never any thought of depriving anybody of any water they wanted to use during the years ’ ’. The only evidence of an objection by Swartz to the use of the lake by others was directed to the building of breakwalls out into the lake which shortened up the volume and reduced power. In other words, outside of brooking no interference with water power, the Swartz family permitted their fellow citizens to enjoy the lake and use its waters as needed. This witness testified there were lots of cottages on the lake before he was born and they have been increasing ever since. After he ceased mill operation, he maintained and controlled the gates and dam until he passed title to plaintiff.
The conveyance gave the owner of the dam the right to flow the land 10% feet. It was rather surprising to hear Mr. Swartz testify that he did not know where that point would be and that there “ was probably lots of time it was over that height ”, but it is evident the figure was given due weight by the designer and owners of the dam through the years because it is exactly that distance, 126 inches, between what is assumed to have been the surface of the water at the original creek level and the lower side of the concrete over the top of the spillway. As would be expected, the water level of the lake varies according to season, atmospheric conditions, run-off, evaporation and use. Mr. Swartz testified the lake is very erratic; that in the Spring it *364 will rise 1 to 2 feet a day; that after a bad storm or quick thaw he has seen it rise 1% foot over night; and it will lower % inch a day just from evaporation. There is evidence that at times of high water the regular gates, the waste gates under the mill, and even the turbines were manipulated to prevent the lake overflowing the road across the spillway, and apparently man-installed mechanisms were not opened quickly enough at a time of extended rainfall in 1926 when the water rose to 97 inches above the bottom of the spillway. Mr. Swartz testified that within the span of his knowledge the water was down to 12 inches over the base of the spillway two or three times for a short period until rain raised the level, and at those times the shore was exposed from 8 to 150 feet, depending on the topography of the bottom; that ‘1 most every year * * # it would get down pretty low * * * about 18 inches or so above there, maybe two feet, different years, depending on the amount of work we had * * * the amount of rain we had during the season Low water, with the resultant reduction in power, was frequent enough to impel the Swartzes, sometime in 1920, to install a gas engine to supplement the water power. Mr. Howard testified that the only time he had observed the water below the 43 inches above the original creek level (which is the top of the concrete forming the bottom of the spillway) was in 1908 when the elder Swartz built the concrete spillway and drew the water down to about 20 inches above the original creek level; that when he swam in the lake as a boy, the shore line varied anywhere from 7 to 15 feet from the breakwall in front of his father’s cottage. Under the Swartz regime the interest was primarily in water power and naturally the lake was maintained at a high level and the gates (approximately 66 inches in height) were closed at night to conserve the water. Mr. Swartz said the feed grinding commenced after harvest and they tried to do most of the sawing in early Spring and Summer, although some years they operated the saw mill all year, using it when needed without giving consideration to whether it would drain down the lake in Summer. Mr. Howard said the Winter level under Swartz in the years within his knowledge was between 31 and 33 inches.
Testimony that a State survey some years back showed this lake to vary from 43 feet in the deepest point to 20,10, 8, 5, 4, 3 feet explains the uneven expanse of shore line exposed at low water. Mr. Swartz said that at times when there was only one foot of water going over the spillway, the shore was laid bare from 8 to 150 feet, depending on topography. Mr. Howard testified that in 1918, when the lake was 50 inches above the *365 base of the spillway, he could walk dry-shod 35 feet from the present retaining wall in front of a certain property. The Association adopted certain levels embodied in lake regulations effective August 13, 1949, all measured from the bottom of the spillway, as follows: maximum high water level, 83 inches; high water level, in excess of 73 inches; Summer level, minimum 68 inches with allowable temporary variable storm fluctuation of 5 inches from April 15, to October 15; Winter level, minimum 32 inches from October 15 to April 15. These levels were not arbitrarily picked from the air. Mr. Howard said the water level committee, most of the members of which had been familiar with this lake for many years, talked with Mr. Swartz at length and with a large number of property owners around the lake before making its recommendations. The Winter level of 32 inches was maintained by the Association from 1949 through 1953 with the exception of 1952 when, in compliance with a petition complaining of interference with wells and fire protection, the level was raised to 53 inches in an attempt to co-operate. But that year there was ice damage to quite a number of docks and they thereafter returned to the 32-inch level, with no evidence of further complaint. There was testimony as to a decision to reduce the water in October to 32 inches to permit Fall cleanup, then increase it to 47 inches November 21 and hold it there until the “ spring break-up of ice, but not before March 15 ” and then return to the 68-inch level through the months when our climate permits greatest use and enjoyment of the lake. However, I find no evidence this plan was ever put in operation.
This controversy is most unusual in that both litigants appear to be in complete agreement as to the nature and seriousness of the problem and their desire that it be solved. Their difference is that only the plaintiff has been moved to action. All concur that this weed growth has been increasing rapidly in late years and that, if it cannot be checked, the lake will deteriorate into a swamp or bog. Both desire the same thing — a clean lake that will continue to hold the large cottage colony, offer recreation to all and support fish life for which it has become famous. Even now, the weeds have reached a stage where they seriously interfere with boating, have destroyed the attractiveness of this body of water and pose difficulties in the pumping of water by the local Fire Department, which so far have been solved by replacing the hose, or protecting it by a large bucket over the end, but the chief admitted it is possible continued groivth of weeds may interfere to a degree where they will not be able to pump water from the lake. In fact, he testi *366 fied that in February, 1955, weeds and silt had so encroached on the area in front of the dam as to destroy the efficiency of the suction hose. According to the letter mailed September 30,1954 to its members, cleaning that area was one of the objectives to be accomplished by the Association when the water was lowered. A member of the Town Board admitted that, if a remedy be not found, the lake will be practically destroyed for boating and fishing and as a desirable cottage site. Yet he refused to join plaintiff corporation, assumes a laissez-faire, let-nature-take-its-course attitude, has done nothing himself, and says that, after discussion, he understands the Town Board does not intend to take any action. This is the more incomprehensible when we consider that as early as December 1, 1952, this board voted to take action ‘1 to see what could be done to clear up the water situation of Findley Lake ” and eight days later held a special meeting with an attorney to explore ways 1 ‘ of dealing with the water situation of Findley Lake as to ownership and the lowering of the gates for several months at a time causing flooding of farm lands and so forth.” Apparently, at that time their attention was not focused on the weed menace, or on failure of wells, fire hazard or imminent danger to health, life and property now so vehemently stressed, but to a possible flooding of farm lands below the dam of which I find no evidence. The record discloses no further action until the Fall of 1954.
Therefore, the true issue is narrowed down to a determination of the rights of the respective parties in the control of the dam and the level of the impounded waters.
In the meantime, when it had been demonstrated that cutting the weeds furnished but temporary relief and afforded no cure or hope of salvaging the lake, representatives of the Association consulted the Conservation Commissioner in Albany. On August 20,1954, at a meeting held in the Findley Lake Fire Hall attended by members and nonmembers, the Association decided by a divided vote to lower the lake level 67 inches starting October 8 to permit repairs to the dam, and to maintain that level until the Spring in order to wage chemical warfare on the weeds. The upper gates were removed October 8, the middle gates about October 15, and the bottom gates around November 21. Defendants had not up to that time, or since, suggested any remedial measure. The plaintiff did not guarantee the result of the use of chemical and so stated but, having been informed by the Conservation Department that it had worked in similar situations, considered it more than an experiment and the most hopeful course to pursue.
*367 Mr. Howard testified that the Deputy Director of the Conservation Department said his organization could not give permission to use a chemical but that chemicals had been used with satisfaction and would accomplish the desired purpose, probably with the loss of some of the smaller ground-feeding fish such as sunfish and bullheads, which should not cause too much worry as the stunted growth of Findley Lake sunfish proved there were too many; and that he did not warn them not to use a chemical. This witness also said that the aquatic biologist in the Albany office to whom he showed a sample of the weed, called it by a Latin name, said he knew all about it and added “ You have a lake. If you want to keep a lake, you have got to do something about it ”; that he, too, informed them, “ We will not tell you any chemical to use, nor will we give authority to use it, but we will tell you this, that the State of New Jersey is having very good luck with this Benechloride chemical, and that that might work” (emphasis supplied); that he pointed out the danger to ground-feeding fish; and that, when they told him they had to lower the lake to repair the dam and suggested putting this chemical on the exposed shore, he said it was an excellent idea. On the trial Mr. Howard maintained that the State officials did not “ recommend ” the use of a chemical in so many words and admitted there was a conflict between that stand and the September 9, 1954 letter sent to members of the Association outlining and reiterating the “ recommendation of the State of New York”. From this it might be inferred that the officers and directors whose names appeared on the letter deliberately conveyed a false impression to the membership. Doubtless the word “ recommend ” was ill-chosen, but it is easy to understand how one listening to the above statements might honestly interpret them as recommendations thinly veiled by a cautious disclaimer of permission. This is borne out by letters in evidence from various branches of the Conservation Department which furnish illuminating reading and indicate that the writers were consciously walking an uneasy line, attempting to assist and satisfy the inquirer and at the same time preserve the department harmless from any commitment. For example, the letter from the biologist of the Western Fisheries District, in answer to inquiry from the Findley Lake Fire Department, stressed his department could not give permission for the use of a chemical such as Benechlor in a lake and pointed out the dangers of such use, yet implied sanction of its use by expressing interest in the outcome of its application along the exposed shore. On the record here, the Referee believes plaintiff was warranted in considering the statements *368 of the officials as equivalent to recommendations, although diplomacy and strict adherence to meaning dictated, a less positive designation.
One of the chemicals mentioned hy the Conservation Department as having been used satisfactorily, and the one chosen by plaintiff, was Benechloride or Benechlor. This can be sprayed on the surface, applied under the surface, or on exposed shore and covered with water within a short time, although it takes several months to kill weed roots. Plaintiff adopted the last method as less hazardous to fish life. The Association started to lower the lake a week earlier than usual to permit repairs to the dam and the cleaning and treatment of the exposed shore. The contractor completed the work on the dam but nature and the Town Board combined to frustrate them in the use of the chemical. By the time the water was down to some 8 inches above the bottom of the flume, Winter closed in and the owners were unable to clean out the lake bed in front of their properties and apply the chemical on the ground, with the result that only about two acres were treated. Mr. Howard said he succeeded in removing the heavy silt and debris from a very small area of about 7 by 20 feet, and that he applied chemical on top of 3 or 4 inches of snow as an experiment, but it did not work, evaporating before it could become effective. Under these weather conditions, owners decided to wait until Spring and apply it after the snow went off before the level was raised. But on March 1, before the ice was out of the lake, the Town Board took control of the dam and raised the level with the result that, as yet, no real test of this chemical has been made on Findley Lake.
It is evident that when news of the proposed lowering of the lake to the base of the spillway spread through the countryside in the late Summer of 1954, smoldering resentment burst into one of the most bitter feuds ever to come before this Referee, although the vocal and militant opposition seems small in numbers. The minutes of the Town Board show that ‘ ‘ several ’ ’ taxpayers appeared at its September 7 meeting and asked what could be done about lowering the lake to such a low level. It developed that the “ several ” were, in fact, four, two of whom were “ particularly perturbed ” because they rented boats, and one of whom did not own lake property. The board’s answer was a petition to the Conservation Department bearing 138 names, circulated at a time when many of the Summer residents were gone. In the judgment of one of the two women who circulated this petition, only 15% or 21 of the signers, at most, lived directly on the lake and she said some lived miles distant. *369 The caption of the petition did not mention that the lake was being lowered a week earlier and 32 inches below the nsnal Winter level maintained by plaintiff to permit needed repairs to the dam on which the existence of this lake as they knew it depended, and also to allow an effort to control the weeds by chemicals. It was evident this witness was familiar with the plaintiff’s letter explaining its purposes, but she testified she did not make mention of weeds or repairs to the persons she approached for signatures. The Conservation Department returned the petition, disclaiming jurisdiction and pointing out the problems raised legal questions involving rights in the use of water and ownership. The board then delegated its Supervisor to deal “as he thinks best with the deplorable condition of the lake * * * at its present low level ” (November 26, 1954) and on March 1, 1955, appointed a Constable and, on receipt of the Supervisor’s report of a conference between the County Attorney and counsel for plaintiff, voted to install its gates in the dam. That day, according to the minutes “ The gates were installed, a day’s work of which the Supervisor and Board can be very proud.”
At that time, over three months after plaintiff’s last gates had been removed, Clifton M. Howard, who had been delegated by the Association to pull its gates in the Fall, was arrested on the charge of committing and maintaining a public nuisance on October 7, 1954 by ‘1 committing acts which annoyed, damaged, injured and endangered the comfort, repose, health and safety of a considerable number of persons * * * and did * * * interfere with, obstruct or tend to obstruct and render dangerous for passage a body of water which has been dredged or cleared at public expense.” On arraignment before a Justice of the Peace, a member of the Town Board, bail was set at $15, and the case adjourned to permit Mr. Howard to procure an attorney. Counsel representing both interests apparently advocated moderation in this criminal proceeding and agreed to the tabling of the case, to be opened at one week’s notice by either party. There it remained dormant at least until the time of the trial of this action.
The clash was now in the open. It was not until the summons and complaint was served May 24, almost three months later, that the Supervisor belatedly suggested the parties should talk over their differences.
While the section was not specified by number in the warrant issued for Mr. Howard’s arrest, its language followed very closely subdivisions 1 and 3 of section 1530 of the Penal Law, and his arrest appears to have been intended as notice to the *370 Association of the ground on which the Town Board was taking possession of its property, and on which it now stands. In the first place, the dam belonged to the plaintiff and the act of Mr. Howard was authorized by the Association and was a normal and legal act in no sense unlawful in itself, a requisite to the establishment of a public nuisance. True, there exists the right of private action for special damages resulting from a public nuisance. (Saari v. State of New York, 203 Misc. 859.) However, the latter question is not before us. Another requisite of public nuisance is that a “ considerable number of persons ” be affected. It has been held by the Court of Appeals, Chief Judge Cullen writing, that: 1 ‘ The expression ‘ any considerable number of persons ’ is used solely for the purpose of differentiating a public nuisance, which is subject to indictment, from a private nuisance. But a considerable number of persons does not necessarily mean a very great or any particular number of persons. The travelers on a highway of a sparsely settled country town and those moving along the densely thronged city street are equally a considerable number of persons, and an illegal obstruction of a highway in the town and that of a city street are equally public nuisances.” (People v. Kings County Iron Foundry, 209 N. Y. 207, 210.)
After quoting the above, the court in the following case quoted from an earlier opinion by its own Department: “ 1 For the interference with the comfortable enjoyment of their homes, for the injury to their property, the owners thereof have an appropriate remedy, if there be a nuisance; but, as to each of them, the nuisance is private, and does not become public, merely because a considerable number may be injured; for, otherwise, it would follow that, in case of special injury to each of a considerable number, no private suit could be maintained. Hence, while the evidence of annoyance and discomfort to those dwelling in the vicinity of the alleged nuisance was relevant, the case has to be considered solely from the aspect of the public or common rights invaded. ’ [People v. Transit Development Co., 131 App. Div. 174, 178.] ” (Emphasis supplied.) (People v. Cooper, 200 App. Div. 413, 417 and eases cited.)
The following case had to do with a criminal action instituted against a transit corporation on the ground that a public nuisance was created by the continuous movement at night of empty ears along its right of way, accompanied by loud noises incident to stopping and starting which many witnesses living along or near the right of way complained were annoying and disturbing to their comfort, health and repose. The Court of Appeals, in affirming the reversal by the Appellate Division of *371 a judgment of conviction rendered in the County Court (258 App. Div. 753), said: “Here noise at one end of the right-of-way would not disturb persons living near the other end, almost a mile away. Each person suffers annoyance or injury only by what occurs in immediate proximity to his own home. Only because the right-of-way is long and narrow do the acts of the defendant corporation cause annoyance to a considerable number of persons, and here, unlike the cases cited by the appellant, it is not the peace and quiet of a community or neighborhood which is destroyed by unlawful conduct which affects the entire neighborhood or community, but the complaint is directed against acts of the defendant which disturb only persons scattered along a narrow private right-of-way.” (People v. Brooklyn & Queens Tr. Corp., 283 N. Y. 484, 491-492.)
Do the facts of the instant case justify defendants’ claim that the lowering of the lake by the removal of all the gates constituted a public nuisance? In the first place, counsel for plaintiff point out that all the resolutions concerning the lake from December 1, 1952 through March 1, 1955, were resolutions of the Town Board and not of the Town Board of Health. Technically, this is true. However, section 302 of the Public Health Law provides ‘ ‘ In towns the board of health shall consist of the town board”; it has been ruled that members of the Town Board of Health shall take and file no separate oath of office other than that of the town office by virtue of which they become members of the Board of Health. (6 Op. St. Comp. 1950, p. 373.) In view of the identity of membership and the closeness of the two boards, the Referee considers that to vitiate the act of the Town Board on such a ground would be to place too narrow a construction on the law.
The difficulty here is more fundamental. The plaintiff Association is claimed to have created a public nuisance imminently endangering the health, life and property of the people around Findley Lake. The Director of the State Department of Health for that district testified that, in the event of an offensive condition, the Town Board of Health has the duty to cause an investigation to be made by a competent authority to determine if the condition constitutes a nuisance detrimental to public health. In spite of numerous urgings from the State Health Department, the Town of Mina has been without a Health Officer since July 1, 1952, because of the board’s refusal to pay the compensation asked by competent physicians. The Town Clerk testified that at least two complaints based on the low water were registered between September, 1954 and March 1, 1955. The board, with no health officer on whom to rely, did not call in *372 a qualified expert to advise it, as its own witness, the District Health Officer, said would be necessary in the case of a group of laymen faced with such a problem, did not even appeal to the District Health Officer for assistance in the matter, and did not notify plaintiff to suppress the alleged nuisance (Public Health Law, § 308). Had they done so and had plaintiff ignored their order, the board could have appealed to the court to enjoin the Association from so lowering the lake. Instead, in silence, one of their number issued a warrant for the arrest of the member and director of the Association who had been delegated to remove the gates some three months earlier, and the Town Board went on plaintiff’s property, installed and controlled gates of their own, and set the Constable to watch for possible interference by plaintiff in his spare time.
In justification of the action of the Town Board, defendants set up three defenses. Under the first, they alleged that the exposed bottom of the lake and the low water level imminently endangered the health, life and property of the people around Findley Lake in three ways, viz.: by noisome odors and unwholesome condition; by handicapping the Fire Department in the performance of its duties; and by rendering the wells useless or nearly dry. Since these, too, sound in nuisance, we shall pause to consider them at this point in the order listed, before taking up public nuisance under subdivision 3 of section 1530 of the Penal Law.
Mrs. Bradley, the Fire Chief’s mother, who lives on the west side of the lake near the village, testified she smelled the lake on two or three warm days in January, 1955, the same odor she had observed for 57 years at times of low water or every time the Swartzes drew it down for power. Another witness who lives about a block north of the dam site testified that at different times on a warm day after the water had been lowered, with the wind in the south, he could smell an odor from the lake, and also an indistinguishable odor from a swamp opposite his home when the wind was in the southeast. The Navigation Commissioner of Chautauqua County, whose duties include patrolling the lake in Summer, said there was always a little odor Summer or Winter along the edges of this small lake but the odor he sensed between October, 1954 and March, 1955 was not so intense as to be offensive in the adjoining hamlet.
It cannot be gainsaid that the portion of the lake bed exposed by the lowered water presented an unattractive outlook over weeds, silt, debris and stumps as claimed by witnesses and disclosed by photographs in evidence. The lake embraces what had been a wooded area as evidenced by the large number of *373 stumps shown in pictures along the bared shore. It would seem owners would have welcomed the low level as an opportunity to remove these usually submerged stumps from in front of their properties. But as Judge VAim said: “ The use made of property may be unpleasant, unsightly, or, to some extent, annoying and disagreeable to the occupants of neighboring property without creating a nuisance.” (McCarty v. Natural Carbonic Gas Co., 189 N. Y. 40, 50.)
Unappealing as this condition may have been to eye and nose, there is no evidence it was unhealthful. To the contrary, the Director for the State Department of Health, whose jurisdiction includes the Jamestown District, testified the lowering of the water to 43 inches above the original creek level from November to March so as to expose 250 feet of lake bottom did not create a health hazard or danger and ‘ ‘ would not create disease in people ”.
There was considerable testimony calculated to support defendants’ contention that lowering the level of the lake adversely affected fire protection. In years past the Hamlet of Findley Lake had a reservoir and hydrants, now discontinued. There is no dispute that during part of the Swartz regime, at least, and under plaintiff the local volunteer Fire Department was permitted to draw water at the dam to fill the tanks on its equipment and to use the water of the lake in fighting fires around its shore, limited only by the topography of the bank and the power of its equipment. There was testimony that, according to the New York State underwriters, the end of suction hose should be submerged in at least two feet of water, although admittedly it could be operated in shallower water but with less efficiency. The Fire Chief also said that for maximum performance the engine should be within 30 feet of the intake, although it would be possible to add 50 feet of hose at the sacrifice of some efficiency. The only place the Fire Department can get water from the lake to fill the tanks is at the spillway, and its chief claims that in the Winter of 1955, after plaintiff had removed all the gates, there was only about four inches of water going over the base of the spillway, and that the mud and silt had so piled up in front of it that they did not have sufficient water. His testimony was very indefinite, confusing and unsatisfactory. At one point he said he does not check the water at this point except when he has to pump, that he does not have jurisdiction to check the level of the water, and did not know there was only four inches going over until he stopped there after the Eliason fire in February, 1955, and then said he thinks he and his assistant did check it probably *374 every month. He testified that a survey showed 40 places around this lake where they could get the hose in with the water at 68 inches, and 14 places at the 32-inch level. On the west shore there is a bank and but four or five spots where they can reach the water with the hose, and he admitted that even with the level at 68 inches, the company would be able to service only a third of the cottages in Winter. He enumerated three fires around the lake from the Winter of 1951 to the Winter of 1955 in each of which the portable pump was used. Here again his testimony is confusing. The chief testified they could not have used this pump had it not been for ice on the lake, and later that they could have set the portable pump sooner if ice had not been there.
The length of time the department has been depending on the lake for water is not clear, but regardless of whether or not this practice was over a period of years, neither the plaintiff nor its predecessors in title, so far as the record reveals ever raised any objections to the Fire Department using the waters of the lake. In fact, back in June, 1950 when the chief pointed out that in times of drought or low water there might not be sufficient water in the creek north of the spillway to fight a possible fire in that section, plaintiff delivered the key to its gates to permit the opening in case of fire on the condition the department would be responsible for damages arising from the use or misuse of the operation of the gates, and volunteered to instruct the members of the department in the proper operation of the gates. This offer was not accepted and the key returned.
So alarming is the hazard of fire that efforts to combat it should be encouraged. However, defendants have failed to satisfy the Referee that the lowering of Findley Lake to the 32-inch level in the Winter, or even the removal of all the gates in 1954-1955 posed the difficulties and dangers now urged. There is no evidence here that, when plaintiff removed the gates in 1954, representatives of the Fire Department, or of the Town Board which subsidized it, were sufficiently exercised by the dangers now claimed to be inherent in low water that they ever requested plaintiff to clean out the silt and weeds alleged to have been piled up at the dam, or sought permission to do so. Certainly, the lack of precise knowledge as to the amount of water available at the dam, and the apparent absence of concern at the time, seems incompatible with the frustrations and handicaps in operation and performance of duties now asserted. They had been faced with the 32-inch Winter level under the Swartz operation, and with lower levels at times of peak loads and dry seasons, The removal of the gates in 1954 *375 did not present an entirely new problem, although it did intensify the one implicit in the fluctuating water levels as controlled by the owners of the dam site for many years. Plaintiff’s September 30, 1954, letter to members stated that, according to a licensed fire insurance underwriter, the lowering of the lake level would in no way affect insurance rates and there is no evidence to the contrary. Of course, this is not conclusive that the lowering created no hazard, but it points in that direction. This department was a member of a mutual aid association and could call in help when needed. So, too, if called on to fight a fire abroad, it could refill its tanks from other sources before returning to home base. It may well be the lowering of the lake in 1954 called for the exercise of ingenuity by those in control, possibly a modification in methods of operation, or even the addition of a few feet of hose, but the record fails to convince me that, with a few minor adjustments, it could not carry out its duties and protect the property in that area.
The first defense in the answer also alleges the adverse effect on “ many ” wells of the lowered water table caused by drawing down the lake level in 1954, and in its bill of particulars defendants list the wells of four property owners, three of whom testified. These are all drilled wells. There seems little doubt that Findley Lake is, in part, spring fed. Plaintiff’s diagram of the spillway bears a notation that in the Spring with gates closed and no spillover, neither any rain nor snow meltoff, the water level, due to the springs, rises 1% inches each 24 hours. Mr. Eliason testified that in October, after the lake lowered about four feet, he started getting air in the line and the water gradually stopped; that he then put the pipe down another four feet without success, so he connected to his next door neighbor’s supply until August of 1955, when he again started to use his own well. The evidence does not enlighten us as to the character or location of the neighbor’s well but it is reasonable to believe it is not far distant and the fact it was able to carry a double load through the period of low water, raises a doubt as to the real cause of failure of the Eliason well. We know his successor in title had experienced trouble with this well with the water at 32-inch level, and the District Sanitary Engineer had pointed out to her that it was “ inconceivable that the mere lowering of the lake level would materially affect those wells which are properly developed and extend into ground water strata,” and had stressed the danger in using water from infiltration wells. Mr. Bradley, father of the chief, who does not intend to do anything toward elimination of the weeds ‘1 as long as this association has a finger in it ” because he thinks drawing the lake down *376 has multiplied the weeds rather than doing good, testified he has a well some 200 feet from the lake that had supplied their needs until the early part of 1955. He said in January the pump began to work longer, and in February they could not get enough water to do the family washing, without waiting for the well to refill. Mr. Milligan, one of the members of the Town Board, testified he had two driven wells — No. 1 about 18 feet deep some 150 feet from the lake, and No. 2 about 23 feet deep, 162 feet from the lake — and that he tried to alternate between them to keep the two wells in operation. He said No. 1 started to pump air four or five days after the Association commenced to lower the lake, which would have been during the time that the upper or 16-inch gate only was removed, leaving at least 53 inches above the bottom of the spillway; and that he was pumping air to such an extent he shut this well off 10 or 12 days later, which would have been a week or 10 days after the second or 21-inch gate was removed, when there must have been 32 inches or more of water above the bottom of the spillway. He also said that from about the month of November until the Spring of 1955 he had to resort to a pitcher pump on well No. 2 because the motor-driven pump would not lift the water. Mr. Milligan claims No. 1 began to operate in good manner the following Spring, although he said he burned out two motors trying to obtain water from it, that the well caved in, and he abandoned it. This, taken with his testimony that about 1953 or 1954 Dr. Bacher, a sanitary engineer and another man came over to examine this well because he “ couldn’t pump water from it with an electric pump and had to use a pitcher pump ” leads to the inescapable conclusion that this well had given cause for concern in the past, and the suspicion that either the well itself or the mechanical means of drawing water were faulty. The difficulty must have been earlier than the witness recalled because Dr. Bacher left the community July 1, 1952. In any event, this testimony is conspicuously contradictory of his unqualified assertion that he had observed well No. 1 since 1928 and prior to September, 1954 had never experienced any difficulty in obtaining water from it.
Plaintiff presented the Regional Director of Public Health Engineering for seven counties including Chautauqua. He testified that drilled wells get their water from the ground water strata penetrated and that there is no relation between water level in the lake and ground water level, unless the water table runs into a lake, that is, unless there is a spring-fed lake, in which case lake level would have some effect on nearby wells, lessening with distance. For instance, he said lowering the *377 lake six feet would lower the ground water level “ a very small fraction of an inch ” and the well level six inches or so.
The State Health Officer for the Jamestown District, called by defendants, testified that around the turn of the years 1951-1952, he received a complaint that there was a relationship between the lowering of water in the lake and the level of water in wells, and made an investigation and study of four or five wells around the lake as to location, construction, water levels at different lake levels, found the wells ‘ ‘ were not very well developed” or adequately protected from surface contamination, conjectured that the wells were for the most part connected with infiltration galleries from the lake and, if so, were unsafe for use, and could go no further than to conclude “ that we could not definitely say that there was a relationship between these two, but that it was distinctly possible ”. He did not say to what extent such a possible relationship would be reflected in the wells. The District Sanitary Engineer, who participated in this investigation, in writing to the complainant, the predecessor in title to Mr. Eliason, said: “It is inconceivable that the mere lowering of the lake level would materially affect those wells which are properly developed and extend into the ground water strata. However the wells most affected when the lake level is lowered are infiltration wells because the source of supply is actually the lake itself. The quality of water from such wells should be regarded as suspicious since it depends on the filtering value of the soil and the quality and proximity of the lake water source. In general, this type of well is unsafe and should not be used without proper disinfection of the water.” (Emphasis supplied.) From this it would appear that any danger to health lay, not in the lowering, but in the use of waters from such wells. Out of the “many” water wells alleged to have been rendered useless or nearly dry, we had the evidence of three owners directed to four wells, none of it satisfactory, none conclusive, and none showing life, health and property had been endangered.
I have carefully studied each of the three areas in which defendants claim plaintiff created a nuisance by endangering the health, life and property of the people about the lake. I find defendant has failed to establish by a fair preponderance of the credible evidence that the lowering of the lake by plaintiff created a nuisance detrimental to public health, whether we consider it from the standpoint of odors and unsightly condition, or of wells, or of fire protection.
Nor do I find anything to bring these defenses within the realm of public nuisance. On him who asserts a public nuisance *378 rests the burden of establishing it beyond a reasonable doubt. The odors were noticed by a very few on rare occasions near the shore; were identified as the same that had prevailed at times of low water for years; and they did not penetrate even into the little community nestled about the foot of the lake. Not only did the record fail to establish a causal relationship between the lowering of the lake and the failure of the wells, but these four wells of three owners are not enough to bring them within that considerable number of people necessary for public nuisance. I believe the exposure of the shore and the matter of fire protection are within the area of common or public interest. But visually displeasing as the fringe of lake bottom may have been, it cannot be extended to a public nuisance under the evidence before me. Nor have the defendants met the burden assumed of establishing beyond a reasonable doubt that the lowering of the lake imposed such handicaps on the Fire Department as to constitute a public nuisance by endangering the life and property of the public dependent on its protection. I find plaintiff created no nuisance either under the Penal Law or the definition of 11 detrimental to the public health ’ ’ used as the measuring rod of the Department of Health.
We shall now return to the public nuisance alleged to have been created through infringement of subdivision 3 of section 1530 of the Penal Law. Defendants claim that, by removing the gates, the plaintiff interfered with, or rendered dangerous for passage this lake which has been dredged and cleared at public expense. We know that around the turn of the century steamboats had been a popular mode of transportation on this lake, with scheduled stops at various landings, including the Assembly Grounds where a little Chautauqua drew many visitors during the season. Findley Lake has no navigable inlet or outlet and now the water traffic is limited to smaller pleasure craft. But 1 ‘ Navigability is not destroyed because of occasional natural obstructions or portages, nor is it necessary that navigation continue at all seasons of the year, and it does not lose this characteristic even if it has fallen into disuse for a hundred years.” (People ex rel. Erie R. R. Co. v. State Tax Comm., 266 App. Div. 452, 454.)
As late as 1950 the Legislature of the State provided for the regulation of navigation and licensing of motor boats on the lakes of Chautauqua County, including Findley. (L. 1950, ch. 780.) It is the settled law of this State that “ a stream which is navigable in fact is navigable in law, even though it is non-tidal ”. (People v. System Properties, 281 App. Div. 433, 444.) Back in the steamboat era, on four occasions between 1896 and *379 1904 the State appropriated a total of $9,000 for dredging and removal of obstructions to navigation in this lake. That was over 50 years ago and the State has asserted no right to the lake or the dam which holds it. When asked to replace the sidewalk over the flume, its Highway Department disclaimed jurisdiction; the State was aware of the existence, and of some of the activities, at least, of the Association; in 1951, the District Sanitary Engineer informed a complainant concerning water levels that his department was co-operating with plaintiff Association in its sanitary improvement program, and that the question of lake level had been “ discussed in the past and was given considerable study by the Association before any constructive efforts were undertaken”; and in 1954 the Executive Engineer in the Albany office of the Water Power and Control Commission, in returning the 138-name petition, wrote that the control of the level in that lake is not under the jurisdiction of the commission, that it had no knowledge of the party or parties in control of the level, and advised consultation with an attorney on the legal questions of rights in the use and ownership of water. Moreover, we must remember that the plaintiff did not remove the last gate until around November 21, 1954, about the time our northern Winter was closing the lake to navigation, and purposed to raise the level at the Spring break-up of the ice but not before March 15, or when navigation was again possible. The members of the Association were property owners about the lake and as interested as anyone in its navigability. Indeed, the lowering, both from the standpoint of repairing the dam and of controlling weeds, was directed at preserving, not interfering with, navigation. It was the weeds, not the plaintiff, which had obstructed navigation on large areas of the lake, and the plaintiff was attempting to overcome this handicap, not on the “recommendation” of the State, but certainly with its knowledge, assistance, and guarded approval. Nor was the plaintiff acting for the selfish interest of its members alone, but in the common interest of all who used the lake for recreation, water supply, or fire protection. Plaintiff was not acting on whim or caprice, but after study and consultation, and faced with an emergency, lowered the water in an effort to gain some advantage over the pernicious growth which was threatening every use and enjoyment made of the lake. The problem and method differed, but the purpose which moved plaintiff to action in 1954 was the same that prompted the State to appropriate money years ago — to clean and improve the navigability of Findley Lake. True, the water was temporarily lowered, but a sizable lake remained and we must bear in mind *380 it was in a season when navigation was at a practical standstill. To urge plaintiff should be penalized for expending its effort and substance in an attempt to restore this lake, just because at one time the State had appropriated money for that very purpose, would be to exalt the letter of the law above common sense and justice. It impresses the Beferee as unreasonable to brand this plan to clean and rehabilitate the lake as a transgression of the statute prohibiting interference with the lake and rendering it dangerous for passage, and I do not believe the Legislature intended so literal and unrealistic an interpretation.
I find plaintiff did not create a public nuisance in violation of subdivision 3 of section 1530 of the Penal Law.
The plaintiff, asserting no right not derived from Swartz, claims the conveyance transferred to it “the exclusive use * * * of the water in the lake, and control of it ”. Defendants vigorously contend that plaintiff does not own the water and that its right is limited to the operation and maintenance of the dam for water power only; that the only purpose for which plaintiff may repair the dam is for water power; that there is an absence of evidence as to any right in the Association through prescription and license, leaving it dependent on its deed.
Let us at this point look more closely at the deed. An examination of the chain of title shows that the early deeds, beginning with the Holland Land Company to Findley in 1820 made no mention of water rights. It was not until the deed of Selkregg to Speckernagle in 1871 that we find the embryo of the flowage and power rights. For 74 years, since 1875, all deeds have contained the right to flow to 10% feet by reason of the dam at the foot of the lake and the provision: “ The parties of the first part guarantee to the parties of the second part the exclusive use of the water power at Findley’s Lake with the right of keeping up and maintaining the same subject to the reservations herein named ’ ’, with the exception of slight variances in the spelling of “ Findley ”, the omission in the last two deeds of “ up ” from the phrase “ keeping up and maintaining ”, and the substitution in plaintiff’s deed of specific reservations concerning the removal of mill machinery in place of the words “ subject to the reservations herein named.”
Thus we have a deed to a property owners’ membership corporation not engaged in business of any kind, conveying property from which the grantor had removed one mill and reserved the right to remove the water wheels and all mill machinery, and yet guaranteeing “ the exclusive right and use of water power.” In my opinion this inconsistency throws the shadow *381 of ambiguity over the instrument and warrants us in looking behind the deed to the intent of the parties. “ [A] reservation or grant in a deed, like every other contract1 must be construed according to the intent of the parties, so far as such intent can be gathered from the whole instrument, and is consistent with the rules of law’ (Beal Property Law, § 240, subd. 3). It is only when language used in a conveyance ‘ is susceptible of more than one interpretation ’ that the courts will look into surrounding circumstances, the situation of the parties, etc. (French v. Carhart, 1 N. Y. 96, 102; Clark v. Devoe, 124 N. Y. 120, 124).” (Loch Sheldrake Associates v. Evans, 306 N. Y. 297, 304-305.) A perusal of the minutes of the Association and a consideration of the facts and circumstances surrounding this purchase leaves no doubt that the main interest of the members centered in the right to use and control the water of Findley Lake not for power but for the betterment and preservation of the lake.. The option described the property as “about four acres of land, mill buildings, dam, and the rights to flow all lands not flowed by reason of a dam at the foot of the lake at a height of 10% feet”, and made no mention of water power. Mr. Swartz had been in touch with Mr. Howard from September 16, 1948, the date of the option, at very least, and before the deed was given he was a permanent member of the Association and, as such, cannot be presumed to have been a stranger to its plans for the improvement of the lake and its watershed area. The mill operations had ceased in 1942; the use of water for power was then discontinued, with the exception of a brief period in 1948 to run a saw in connection with the dismantling by Mr. Swartz of one of the mills. The very fact this plaintiff was willing to pay $4,800 is some indication the parties considered something of value and use to the grantee was being passed. Shortly after taking title, the Association tore down and removed another mill long out of use and an old barn as unsightly and a fire hazard, and cleaned up the mill site. It is the picture of the end of an era. A reading of the testimony of Lawrence Swartz makes it crystal clear that in his mind the right of his family and himself to handle the level of this lake in accordance with their needs and seasonal conditions was so unchallenged and stabilized that he spent no time in analyzing the precise wording of the deeds. He neither knew the exact location of the line of permitted flowage, nor considered the meaning of the exclusive right to use water power in the guarantee clause, “ because when any change of property was made, and when any deed was given, it was simply a copy of this with the change of names, and that was all there was to it.” Plain *382 tiff’s deed must be read in the light of the circumstances and situation of the parties prevailing at the time. To adopt the strict interpretation of the words urged by defendants here would produce ‘ ‘ a result which is not in harmony with the obvious intent of the parties ”. (Fox v. International Hotel Co., 41 App. Div. 140, 142, affd. 168 N. Y. 658; Clark v. Devoe, 124 N. Y. 120.) The Referee is convinced it was the understanding and intent of both parties to convey to plaintiff the right to use and control the water of Findley Lake within the 10%-foot flowage maximum, and that the reference to water power in the deed was an inadvertent carry-over from previous conveyances.
While the intent of the parties may explain what they thought was being conveyed, it is elementary that the grantor could convey no more than he owned. (Hammond v. Antwerp Light & Power Co., 132 Misc. 786.) It is true the lake was originally impounded and used for power, but when the mill wheels finally ground to a stop, Mr. Swartz did not cease to maintain and control the dam. He neither removed the gates entirely, nor left them in place unattended. Rather he continued to regulate the flow in accordance with the quantity of water and the seasons.
Just what did this deed purport to convey? First, it passed title by metes and bounds to a parcel of land 4.07 acres more or less, partly north of the dam site where the mills had been located and extending out into the lake on the south some 40 feet or an estimated area of one-half acre, including the dam and spillway which ran from the lake under the road. Second, it granted to plaintiff “ the right to flow all land at present flowed by reason of the dam at the foot of the lake, a height of 10% feet ”. The sentence ends with a period and that period is important. It closed and set apart the grant or conveyance from the guarantee of power that followed. Nor can it be discounted as an inadvertence of the transcriber of plaintiff’s deed, nor as a newcomer in this chain of title. Since 1874 the grant and guarantee clause have been distinguished and separated by a period. I believe this is a situation similar to the one before the court in a case where a contractor “guarantees” the proper performance of its contracts with subcontractors. There the Court of Appeals, although reversing a judgment below in its favor, held: “ The word ‘ guarantee,’ used in the contract, is not intended in a technical legal sense, but as a synonym of ‘ agree ’ or ‘ promise.’ ” (Deeves & Son v. Manhattan Life Ins. Co., 195 N. Y. 324, 331.) For 74 years this clause has stood in the successive deeds separated by phraseology and punctuation from the grant.
*383 In the Cromwell v. Selden case (3 N. Y. 253), the owner of lands on a mill stream granted a portion thereof, with water sufficient to operate a saw mill at all times when there should be more than enough to drive a grist mill with three run of stone and certain other specified machinery. When the case reached the Court of Appeals, that tribunal distinguished two cases urged by the defendant there as support for restricted use by pointing out (p. 260) that in one, Ashley v. Pease (18 Pick. [35 Mass.] 268) “ the covenant of the grantee himself amounted to an express prohibition of the use of the water for any other purpose than that specified in the grant”, and that in the other, Strong v. Benedict (5 Conn. 210), it was clear from condition, situation of the parties and other collateral facts known to them at the time, that it was intended to restrict use as well as quantity. In affirming the holding below that plaintiff was entitled to use the water for any purpose provided he did not exceed the specified quantity, the Court of Appeals said (pp. 255-256):
“ It is a general rule of construction, applicable to grants of water powers, that when the question arises whether by a grant of a sufficient quantity of water to propel a particular kind of machinery, the terms employed are used merely to indicate the quantity of water intended to be granted, or to restrict the use of the water to the machinery specified, the former construction is to be favored, when the language of the grant will admit of such construction. The grounds upon which this rule rests are twofold. First, it is more beneficial to the grantee, without being more onerous to the grantor, that he should be permitted to apply the water granted to any machinery he pleases, not requiring a greater amount of power than that specified in the grant. Secondly, it is supported by public policy. The interests of the community will generally be best promoted, by allowing an unrestricted application of the power to such machinery as will be most profitable to the owner (Ashley v. Pease, 18 Pick. 268).
“ There is another rule of construction equally well settled, of which the defendants claim the benefit. It is, that in every grant, it being the act of the grantor, all doubtful expressions are to be taken in a sense most favorable to the grantee. Where terms are employed which, unexplained, are susceptible of two constructions, if the intent of the parties is not otherwise apparent, that construction is to be adopted, which will operate most to the advantage of the grantee.” (See, also, Hall v. Sterling Iron & Ry. Co., 148 N. Y. 432, for review of case law, Carthage Tissue Paper Mills v. Village of Carthage, 200 N. Y. 1.)
*384 Back in the water-power conscious days, the disputes centered around whether a quantity of water designated for a specific mill or machinery could fie applied to another type of operation. Recognizing changing conditions and demands, the courts favored easing of cramping restrictions and encouragement of the march of progress, unless the clear intent of the parties dictated otherwise. The case at fiar illustrates changing uses —woolen mills, grist mill, sawing and planing mills — and changing methods — waterwheels, steam turbines and even auxiliary motor power. Now, it is no longer a question of change from one type of mill or mechanism to another, but from one use to another. However, the same principle obtains.
The deed gave the right to flow to 10% feet with no minimum expressed. As I understand, all agree the flowage maximum was measured from the surface of the original creek, a point to which it cannot be lowered so long as the base of the spillway extends 43 inches above the creek level. The rule of unrestricted use so clearly enunciated in the Cromwell case (supra) in 1850 has been cited through the years. In the following case (1952), before execution of the deed to the plaintiffs’ predecessors containing the reservation of certain water rights which formed the basis of the litigation, the then owners were using water from plaintiffs’ lake to operate their mill, for general farm purposes, and also were selling water to a nearby hotel now owned by defendant. The use for mill purposes was later abandoned. The trial court held that the right reserved was not more than an easement appurtenant to the mill lot permitting the use of water for the now discontinued mill uses only, and gave judgment for plaintiff. The Appellate Division reversed and held defendant had right to use water for certain purposes. The Court of Appeals pointed out that, since plaintiff only appealed, it could go no further than affirm the Appellate Division, although it was in agreement with defendant’s position “ as expressed in her answer, that by her succession to the water rights reserved in the 1919 deed, she ‘ is entitled to the sole, absolute and free use of the waters of Loch Sheldrake between the low and high water marks for the benefit of her business and business properties.’” (Emphasis supplied.) (Loch Sheldrake Associates v. Evans, 306 N. Y. 297, 302, 307.)
I, therefore, hold that the “ guarantee ” of exclusive right and use of the water power was an agreement separate and distinct from the grant, and also, that when construed according to the intent of the parties as gathered from the whole instrument, the situation, conditions and collateral facts known to them at the time, and in the light of the pertinent law, did *385 not limit the use of water to power purposes only, but related to quantity for any use.
In its second defense that a prescriptive right has accrued to the town, its residents, the riparian owners along the lake and all the defendants to have the lake level maintained at the height of the town-placed gates, defendants depend in part on the alleged expenditure by State and town of public moneys on lake and dam site, and the claim that the dam and spillway are located in the confines of a public highway. It is true there has always been a road of some kind over the spillway, the earliest one mentioned consisted of “ plank laid across the flume or exit from the lake ”. When the concrete flume was constructed in 1908, a more substantial road was built on top of it, and it has been a State highway for years. But a representative of the abstract company testified that, on search, he found no easement or title fee to the State of New York, the County of Chautauqua or-the Town of Mina. However, defendants point to the minutes of the Town Board as proof of the town’s interest in this property. As might be expected, there was considerable activity in this area about the time the elder Swartz constructed the concrete spillway in 1908. The minutes of the Town Board show: (1) in May and June, 1908, the board authorized a concrete breakwater to be constructed “ on the west side of the lake in the village of Findley Lake ”, it would seem some distance from the dam; (2) in the Fall of that year the board sanctioned a change by the Highway Commissioner in the line of the highway near the Swartz mill to align the south edge with the iron railing next to the lake, and the Highway Commissioner requested the board to consider repairs to “ bridge at the foot of Findley Lake near Swartz Mills ”. We are not enlightened on the action taken, neither is it definite whether this bridge was over the flume or 11 another plank area, a smaller place, further down the road to the west, where they hauled logs across the road.” Certainly the straightening of the highway line in no way interfered with the use of the dam by the owner. (3) Two years later the board authorized a concrete breakwater between the Lewis lot along the lake to the flume and a sidewalk from the Lewis Building to the flume. (4) As late as 1914, money was appropriated for the repair of town highways including sluices, culverts and bridges less than five feet, and all bridges of five feet or more, but there is nothing to indicate the roadway across the top of the spillway was considered as a bridge or included in this appropriation. While it is apparent the Town of Mina on a few occasions authorized some work on the waterfront in the vicinity of the dam, the limiting phrase *386 “ to the flume ” is, to my mind, highly significant. It indicates the town considered the flume area out of bounds so far as its work was concerned. Certainly, I do not find enough here to support a claim that the Town of Mina ever exercised, or claimed, control over the dam site up to March 1, 1955, and with this the Town Board was in agreement as late as 1949. At least, its minutes show that, when in that year a representative of the Association requested the board to clear out the sidewalk at the foot of the lake and build a breakwater in its place, that body decided to consult an attorney and a week later rejected the application on the ground it was private property and it had no jurisdiction. A similar request a month later that the Town Board build a wall at the foot of the lake and a walk between the lake and State highway, was likewise rejected for lack of jurisdiction. So, too, the Association asked the county and State to replace the worn-out sidewalk and were met by refusal based on jurisdictional grounds, although the State did co-operate to the extent of dumping a number of loads of gravel for the fill under the present walk and later, when the gravel was being undermined by the lake, promised to furnish some black-top material, 1 ‘ if they ever had any extra left over from a job some time close by they would drop it off and put it in there, which they did.” Defendants have failed to prove any ownership or control in the State, County or Town of Mina. Instead of a dam and spillway within the confines of a highway, the most we have here is an easement by prescription in the State to maintain its highway over the spillway.
The fact plaintiff requested these various governmental strata to rebuild the sidewalk that passed over the top of its spillway, is not tantamount to recognition of right to control in any of these municipal levels. The Association and its predecessors in title had permitted the public to enjoy free passage over the flume by foot and vehicle and, even were we to hold that that permissive right had ripened into a prescriptive right to use the top of the spillway, it cannot be extended into a relinquishment of control of the dam, gates and spillway. The fact the town built only “to the flume ” evidences that it has long recognized the dam site as outside its control.
. Defendants also allege in support of prescription that for the past five years and more the waters of Findley Lake have been maintained at a level equal to the top of the town-installed gates. The evidence disproves this assertion.
In his brief, defendants’ counsel expressed the belief the Beferee would discuss the law of riparian rights as a bar to *387 future litigation. Anxious as this court is to be helpful to all parties in this tragic situation, it feels that to attempt to include in this decision questions without supporting testimony would be to reach beyond its province. There is no evidence before me that any individual defendant is a riparian owner. There is no evidence of any town property of that character in the custody of the Town Board. While a few persons complained to the board when it was learned the lake was to be lowered in 1954, there is no evidence this board was authorized to act for private riparian owners, nor had it the power so to do. (Wells v. Town of Salina, 119 N. Y. 280, 287; Howard v. Town of Brighton 143 Misc. 265, 268.) There was some testimony that the cottage lots around the lake ran to high-water mark, but this was not definite or substantiated, and the owners were not defendants so far as the court knows. The nearest approach was Mr. Milligan who is the owner of property on which are two wells some 150 feet from the lake, but we are not enlightened as to whether his property stretches to the lake or whether lots owned by strangers intervene between him and the shore.
But even were we to assume for the moment that the “ Town of Mina, its residents, the riparian owners, and all these owners of property on the lake ” had acquired a reciprocal prescriptive right in the lake, as urged by defendants’ counsel in his opening, such a right has not been violated or impinged upon by the action of plaintiff in the instant case. The plaintiff did not drain or destroy the lake. A temporary lowering of Findley Lake to repair the dam, and, if possible, destroy the weed that is strangling this body of water, can by no stretch of the imagination be construed as depriving the interests referred to of any prescriptive right. Plaintiff was acting to preserve and maintain the dam and lake. Like many remedial treatments, this temporary exposure of an unsightly fringe of lake bottom had an unpleasant angle, but it was done in the hope of combating a condition even more distressing to all.
While the Swartz family, and presumably earlier owners, kept the water level at a height to best serve their mills so far as possible, this record makes it clear that nature and man accustomed the dwellers around the lake to fluctuating levels, and that those who chose to live about this dam-controlled body of water accommodated themselves to its changes. There is no question all who wished to do so used the lake for boating, fishing, swimming and picnicking, but that is a permissive right and does not carry with it the authority to control. As was said in the following case instituted to determine the rights, titles and easements of the parties to a lake where the defendant *388 held under a deed specifying ‘1 ‘ and far enough into said pond to furnish water’” for domestic purposes: “The defendant has not gained a presumptive right to use the lake for boating, swimming, or fishing. Its user and that of its predecessors has not been adverse. It has been permissive, like the user of the general public in the vicinity. Very clear proof of adverse user under claim of right is necessary to acquire prescriptive rights to use the waters of a lake, otherwise it would be exceedingly difficult for the owner to protect his title, especially when the lake is used permissive'iy by the public. There must be some specific assertion of right, otherwise the user will be presumed to be either permissive or trespassing. (Commonwealth Water Co. v. Brunner, 175 App. Div. 153, 159; Nellis v. Countryman, 153 App. Div. 500.) ” (Noble v. Echo Lake Tavern, 142 Misc. 427, 428; see, also, Tripp v. Richter, 158 App. Div. 136.)
In the instant case, I find nothing more than a permissive right to the public to use the waters of this lake for boating, fishing, swimming and picnicking at the level maintained at the time by the owner of the dam. The lowering of the lake in the Fall of 1954 did not interfere with any of these uses and, on the contrary, was calculated to benefit them.
However, convinced as I am that the motive which prompted counsel’s suggestion of a discussion here of riparian rights was founded on the hope of forestalling further litigation, I have concluded, not to decide, but to vigorously urge that, should the future disclose any procedure holding out a reasonable prospect of conquering this weed-scourge, the party so conceiving such a plan will submit an outline of the proposal through the attorneys for the respective interests. During the trial, counsel, while forcibly championing the clients’ divergent points of view, exhibited a dignity, respect and restraint which commanded the admiration of the Referee and did much to lift the litigation above the bitterness and emotional opposition which had colored this controversy. And it is my firm conviction that, together, counsel could explain and resolve any misunderstandings arising from an anticipated course of action before they exploded into litigation. In this they should have the co-operation of the respective clients. As Chief Judge Church wrote back in 1873 when considering a “ditch” dispute, “If the parties had expended, in the repairs of the ditch in controversy, one-half of the amount incurred in the prosecution and defence of this action, their respective farms would have been protected from injury by the overflow of water, and those fraternal relations which ought to exist between brothers, might have remained unimpaired. The slightest attention to the spirit of *389 the golden rule, would have induced an adjustment of the points in dispute to the mutual satisfaction and advantage of both.” (Roberts v. Roberts, 55 N. Y. 275, 276-277.)
The defendants set up public interest as a third defense, alleging that the reliance of the public for many years on the continuous level of not less than the top of the town-installed gates, and its use of the waters and beaches for fishing, swimming and picnicking has affected that minimum level with the public interest. Counsel cites Munn v. Illinois (94 U. S. 113) in support of the proposition that private property devoted to a public use is subject to public regulation. However, a study of that case shows the court there was dealing with certain infringements of the State act to regulate the operation of warehouses and elevators by the owners of an elevator developed with private capital but used for the receiving and storing of grain from the western States and funneling it into the market for a price. And the cases analyzed in that decision were directed to the operation of ferries, wharves, common carriers and facilities in the nature of public utilities of which the public was invited to make use for hire, and with reference to which Chief Justice Waite was writing when he said (p. 126): “ we find that when private property is ‘ affected with a public interest, it ceases to be juris privati only ’ ’ The dam here under consideration was purely a private venture installed to supply water for its owners only, with no obligation, based on a consideration, created to maintain it for the public. In the instant case we should remember that the defendant town, as well as the State, has disclaimed jurisdiction in this dam site. The public, with the exception of those who became members of plaintiff Association, made no effort to save or improve this lake. Mr. Milligan, who is a defendant individually and in his capacity of member of the Town Board that seized the dam, admitted under questioning that, if the present rate of weed growth continues, it will not be long before the lake will be full of weeds, practically destroyed for boating and fishing and as a desirable cottage location, and yet he takes the apathetic attitude that to let nature take its course is “ about the only course we have left to us ’ ’.
In temporarily lowering the lake, plaintiff was not attempting to deprive the public of the use and enjoyment of this body of water. It was merely trying to accomplish what the public in general had not been disposed to do — save the lake for the benefit of all.
Defendant argues that any good intentions of plaintiff have no place in this litigation because, if it can lower the lake to kill *390 weeds, it can do so for any purpose and so could its unknown successor in title whose intentions cannot be foreseen. It impresses me this is unnecessarily reaching into the future for improbable trouble when there is more than enough to suffice in the present. There is no controversy that plaintiff would be within its legal rights if it abandoned the dam completely. (Hammond v. Antwerp Light Power Co., 132 Misc. 786; Munn v. Illinois, 94 U. S. 113, supra.) However, there is no hint of such intention here and it is highly unreasonable to believe these property owners would expend so much money to acquire title to the dam site and so much time and effort to improve the lake, only to abandon the dam on which the existence of this body of water depends. We must recognize that the interests of the large membership of plaintiff corporation in this lake are essentially those of the public at large. They desire the same thing — a clear, attractive lake as a setting for their cottages and as a place of recreation. All are interested in preserving the fishing. There is evidence that there is always some Winter kill of fish due to reduced oxygen from the ice cap, and naturally the lower the water, the less oxygen. But there is also testimony to the effect that the oxidation inherent in the decay of large quantities of muck, silt, debris and weeds likewise reduces oxygen content of the water. I think no one can say to what extent the exposure of the shore counterbalanced the effect of the lowered water, but it is self-evident that, if this weed menace is allowed to worsen, it will reach a point where it is detrimental to fish life at all seasons. Even now, it interferes with boating and fishing.
I find the waters of Findley Lake are not clothed with a public interest.
Turning to the subject of trespass, plaintiff’s counsel assert that the Town of Mina had no right to appropriate and deprive it of its private property, and that under the well-recognized principle of due process guaranteed under both the Federal and State Constitutions the acts of the Town Board and its members were clearly unlawful. (Central Sav. Bank v. City of New York, 279 N. Y. 266, 277, cert. denied 306 U. S. 661; Panhandle Co. v. Highway Comm., 294 U. S. 613, 622-623; Londoner v. Denver, 210 U. S. 373, 385, 386; Matter of Trustees of Union Coll., 129 N. Y. 308, 313-314.) This doctrine is fundamental and needs no review.
Having found that in lowering the water in the Fall of 1954 the plaintiff created no condition endangering the health, life and property of the people living around the lake, and no public *391 nuisance, the entrance of the Town Board of Mina, its officers, agents and servants, upon the property of the plaintiff at the dam site, and the installation and operation of town-owned gates for the purpose of controlling the level of the lake without the owner’s knowledge or consent, constituted an interference with plaintiff’s rights, and a trespass upon its property within the doctrine enunciated by the Court of Appeals in these words: “ whoever abates an alleged nuisance and thus * * * interferes with private rights, whether he be a public officer or private person, unless he acts under the judgment or order of a court having jurisdiction, does it at his peril, and when his act is challenged in the regular judicial tribunals it must appear that the thing abated was in fact a nuisance. This rule has the sanction of public policy and is founded upon fundamental constitutional principles.” (Emphasis supplied.) (People ex rel. Copcutt v. Board of Health, 140 N. Y. 1, 10.)
As a result of the foregoing study, I hold:
1. That the plaintiff, Findley Lake Property Owners, Inc., by the conveyance from Lawrence L. Swartz under date of August 13, 1949, acquired title to 4.07 acres of land, embracing the dam, gates and spillway, and the right to the flowage of the waters of Findley Lake in quantities permitted in said deed; that plaintiff and its predecessors in title have had and maintained a continuous, uninterrupted and exclusive right to such flowage for upwards of 50 years and plaintiff still has that right;
2. That the defendants, in installing and operating the town-owned gates in plaintiff’s dam on March 1, 1955, trepassed upon the lands and premises of this plaintiff and unlawfully took possession of its property without its knowledge or consent;
3. That the plaintiff is entitled to judgment permanently enjoining and restraining these defendants, their agents and servants, from trepassing upon the property described in said deed and especially the portion commonly designated as the dam, gates and spillway situate at the outlet of Findley Lake, Chautauqua County, New York; also, from in any manner interfering with, or attempting to operate or destroy the said gates or dam or render the same, and the spillway connected therewith, ineffective, or to manipulate the said gates, dam or spillway so as to affect the water flowage of said lake;
4. That plaintiff is entitled to continued, undisturbed and permanent possession of the premises described in the complaint.
5. That, while plaintiff has failed to prove substantial damages as a result of said seizure and trepass, nevertheless, it is *392 entitled to nominal damages of 6 cents. (Henry Hof, Inc., v. Noll, 273 App. Div. 361; Rusciano & Son Corp. v. Mihalyfi, 165 Misc. 932; Skinner v. Allison, 54 App. Div. 47.)
The injunctive relief prayed for by defendants is denied, with exception.
The motion to dismiss the complaint made at the close of plaintiff’s case, and renewed at the close of the proofs, upon which decision was reserved, is denied, with exception. Costs to plaintiff. Judgment is so ordered.